**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-390-DLF** |
| **v.** | : | |
| | : | |
| **AMANDA JEAN MONGELLI,** | : | |
| **VALERIE SUE RUSHING,** | : | |
| | : | |
| **Defendants** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Mongelli and Rushing to 30 days incarceration on Count Three and 36 months' probation on Count Four. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

## I.     Introduction

Mongelli, a 38-year-old child-care worker, and Rushing, a 36-year-old plumber, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Mongelli and Rushing each pleaded guilty to two counts: 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in a Capitol building or grounds) and 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in a Capitol building). The government's recommendation is supported by Mongelli and Rushing's conduct: (1) entering the Capitol not once, but twice, and walking towards the area where they knew another rioter had been shot; (2) chasing emergency personnel as they attempted to rush Ashli Babbitt to an ambulance; and (3) providing false information to police, claiming initially that Mongelli was pushed into the Capitol by other rioters and that Rushing did not enter the Capitol at all.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for their actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Mongelli and Rushing's crimes support a sentence of 30 days incarceration on Count Three and 36 months' probation on Count Four.

## II.      Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF Nos. 27, 28.

*Defendants Mongelli and Rushing's Role in the January 6, 2021 Attack on the Capitol*

On December 23, 2020, Rushing sent a message to group of four individuals stating, "[m]e and Amanda r going to Washington DC January 6th you guys going." Mongelli, a participant in

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

the group text, responded, "I got the days off …"  When asked what they were going to DC for, Mongelli said, "[t]he protest at the white house.  Valerie wants to go."  Rushing explained,

> I don't know if u guys been following everything but I have and from the things a seen and heard. If fucked up and there was so much fraud it's crazy. And the big Tex censoring is against my rights of freedom and free speech. So ya I want to go and stand up for what I think is right. I might not be able to do much to change anything but I can still got to support

Rushing followed that up with, "Me and Amanda are taking off.  This is going to make history I don't want to miss it."

Mongelli and Rushing left Florida on January 5, 2021, and arrived in Washington, D.C., the following morning.  On January 6, 2021, Mongelli and Rushing attended a rally by the Ellipse to support the former President.  They underwent extensive security screening measures to be in attendance.  After listening to the former President, they decided to go to the Capitol.

The pair entered the restricted grounds and, at 2:40 pm, Mongelli messaged a family member, "[s]omeone got inside and was fighting with police."  Mongelli and Rushing approached the East Front House Door at approximately 2:44 pm. Around the same time, Mongelli messaged a family member, "I'm goin in the capital."  They peered inside before entering the Capitol at 2:45 pm.  Rushing carried an American flag that she brought from home.



Image 1: Screenshot from Exhibit 1 at 5:04 showing Mongelli (circled in red)
and Rushing (circled in yellow) standing outside the East Front House Door

      The pair walked by a metal detector as they entered the Capitol. Rushing stopped to look

at a security stand and Mongelli used her cellphone to record events around them.



Image 2: Screenshot from Exhibit 2 at 5:38 showing Mongelli (circled in red)
and Rushing (circled in yellow) inside of the Capitol

At just about the same time, Ashli Babbitt was shot when she tried to climb through a broken window to enter the Speaker's Lobby near the House chamber, a location fairly close to the East Front House Door.  Mongelli and Rushing then exited the Capitol with a group of rioters, less than a minute after they first entered the Capitol.

Mongelli and Rushing reapproached the East Front House Door at approximately 2:47 pm.



Image 3: Screenshot from Exhibit 1 at 7:26 showing Mongelli (circled in red)
and Rushing (circled in yellow) standing outside the East Front House Door

They tried to reenter the Capitol at approximately 2:49 pm but backed away from the door as other rioters continued to exit the Capitol.  As they stood by the doors, rioters around them screamed, "you fucking murderer," and "it's your fucking fault she got shot," and "you bunch of fucking communists."  *See*, Exhibit 3 (video recorded by Mongelli).  The door alarm was blaring and audible even over the shouts of other rioters.  *See, id.*   After standing outside the East Front House door for approximately five minutes, now knowing that someone inside had been shot, Mongelli and Rushing reentered the Capitol at 2:51 pm.



Image 4: Screenshot from Exhibit 1 at 11:26 showing Mongelli (circled in red)
and Rushing (circled in yellow) reentering the Capitol through the East Front House Door

After reentering the Capitol, Mongelli and Rushing stood near the security stand (though of course, as with their first entry, they did not subject themselves to any screening) before turning down a hallway that led towards the Speaker's Lobby. Mongelli messaged a family member at 2:53 pm, "Someone got shot. I'm inside the building."  They stood by and watched as police responded to the scene.



Image 5: Screenshot from Exhibit 4 at 0:01 showing Mongelli (circled in red)
and Rushing (circled in yellow) in a hallway close to the Speaker's Lobby

Mongelli and Rushing were forced out of the Capitol by law enforcement and exited through the

East Front Door at approximately 2:54 pm.

After exiting the Capitol, Mongelli and Rushing chased police and emergency responders

as they rushed to get Babbitt into an ambulance.  Both Mongelli and Rushing used their cellphones

to record the scene, and Rushing ran up to the side of the gurney to record Babbitt's face and

injuries.  *See*, Exhibits 5 and 6 (videos recorded by Rushing and Mongelli) (filed under seal).

Rushing yelled, "Look what they did."  An officer had to tell Rushing, Mongelli, and other

members of the crowd to get back. *See*, Exhibit 6.

At some point, Mongelli and Rushing also joined a large crowd that had gathered on the North Terrace.  Members of the crowd around them yelled, "push forward" and "push, push, push."



Image 5: Screenshot from Exhibit 7 at 0:01 showing the mob outside of the North Door

Rushing commented, "he's going to try to break the window" as she recorded the mob around her.  *See*, Exhibit 8.  She saw, and recorded, police attempting to protect the North Door.



Image 5: Screenshot from Exhibit 8 at 0:30 showing officers trying to protect the North Door.

Mongelli and Rushing also watched as other rioters destroyed journalists' equipment. *See*, Exhibit 9.  Rushing commented, "they just lost all their shit." *See, id.* at 0:35. Acknowledging the violence going on around them, Mongelli said, "it's not worth their life right now." *See, id.* at 0:45.

Mongelli continued to text while on Capitol grounds.  At approximately 3:40 pm, Mongelli messaged a friend, "Some one dead already police killed her. We were there."  A few minutes later, she said, "We have video of the dead [*sic*] gitl."  Both Mongelli and Rushing shared the videos they recorded, including videos of Ashli Babbitt's injuries, with others.

Mongelli and Rushing began driving back to Florida sometime before 6:30 pm.  While on the way home, Mongelli told an acquaintance about their experience, "Got flash bomb to the face and fucking tear gas all over me. That shit itches…."  She explained, "We were inside the capital when the girl got shot."  She also described her exit from the Capitol, "They shoved us out. There were so many cops. They started surrounding us."

The following day, Mongelli appeared to be proud of her experience.  She texted a friend, "Event of a life time omg. I got a flash bomb right in front of me and we got smoke bombed and pepper dusted." She also admitted to being inside the Capitol, saying, "I was inside the capital though lol…We didn't go far in but I saw all the broken windows and shit."

*Mongelli and Rushing's Interviews*

On May 26, 2021, Mongelli and Rushing voluntarily spoke to police in a joint interview. Mongelli and Rushing admitted to traveling to Washington, D.C., and to going through security to watch the former President speak.  They both explained that they stayed at the rally until about 1:30 pm and then walked to the Capitol.  Mongelli said that by the time they arrived at the Capitol the barricades were down and there were hundreds of people on Capitol grounds.  Rushing explained that the barricades were either moved to the side or were laying down.  Both minimized their conduct. Mongelli claimed that she did not want to go inside but was forced into the Capitol by the crowd and that she exited the Capitol as soon as she was able to.  Rushing similarly claimed that she and Mongelli were separated when the crowd pushed Mongelli into the Capitol.  Rushing claimed that she grabbed Mongelli as soon as she could and pulled her out of the Capitol.  Rushing also claimed that she never entered the Capitol.  Both Mongelli and Rushing agreed to provide the officer with videos they recorded on January 6.  Though Capitol security cameras show at least Mongelli recording while inside the Capitol, both Rushing and Mongelli only provided police with video filmed outside of the Capitol.

Mongelli and Rushing voluntarily spoke to police again on July 2, 2021. During that interview, they both admitted to entering the Capitol willingly.  Both claimed that they just wanted to see the inside of the Capitol because they had never been there before. Neither admitted that they had entered the Capitol twice.

*The Charges and Plea Agreement*

On November 9, 2023, the United States charged Mongelli and Rushing by a four-count Information with violating 18 U.S.C. 1752(a)(1) and (a)(2) and 40 U.S.C. 5104(e)(2)(D), and (e)(2)(G). On April 3, 2024, pursuant to plea agreements, Mongelli and Rushing pleaded guilty to Count Three of the Information, charging them with a violation of 40 U.S.C. 5104(e)(2)(D), and Count Four of the Information, charging them with a violation of 40 U.S.C. 5104(e)(2)(G). By plea agreement, Mongelli and Rushing each agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Mongelli and Rushing now face sentencing for violating 40 U.S.C. 5104(e)(2)(D), and (e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, both Mongelli and Rushing face up to six months of imprisonment and a fine of up to $5,000 on each count of conviction. Mongelli and Rushing must each also pay restitution under the terms of their plea agreements. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 30 days incarceration on Count Three and 36 months' probation on Count Four.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Mongelli and Rushing's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for misdemeanor defendants like Mongelli and Rushing, the absence of violent or destructive acts is not a mitigating factor. Had Mongelli and Rushing engaged in such conduct, they would have faced additional criminal charges.

One of the most important factors in Rushing and Mongelli's case is their decision to re-enter the Capitol despite knowing that a rioter had just been shot.  Instead of clearing the area and giving emergency personnel the space to respond, they moved towards the area where Babbitt had been shot.  Though they agreed to comply with extensive security screening to watch the former President speak, they blatantly bypassed security in the Capitol (walking past a magnetometer), ignored the blaring alarms, and entered despite acknowledging that police were trying to keep people away with tear gas.   Neither have expressed remorse and both minimized their conduct— twice—when they were later interviewed by police.  In addition, their conduct and statements regarding Ashli Babbitt and emergency personnel is an aggravating factor. Rather than removing themselves from a dangerous situation after Babbitt was shot, they instead chose to position themselves close enough to emergency personnel to record gruesome footage of Babbitt's injuries, and Mongelli seemed to brag about this, including by telling others "We have video of the dead [*sic*] gitl."

13

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Mongelli and Rushing's History and Characteristics

As set forth in her PSR, Rushing's criminal history consists of a 2006 conviction for burglary, a 2007 conviction for domestic battery, and a 2013 conviction for possession of marijuana.  Rushing violated the terms of probation on the burglary conviction by smoking marijuana, moving from her residence without the consent of her probation officer, and engaging in new criminal conduct (the conduct that formed the basis for the domestic battery conviction). Mongelli has no criminal history. Both Mongelli and Rushing have been compliant with the terms of pretrial release.  Both Mongelli and Rushing reported traumatic childhoods.  While this Court may consider these facts, that trauma does not absolve their criminal liability.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Neither Mongelli nor Rushing have expressed remorse for their actions on January 6, and both lied to police. Their lack of remorse reflects the need for a sentence that will deter them from similar wrongdoing. Rushing's prior experience with the justice system did not deter her from committing new crimes on January 6. Despite this, given her age at the time of her prior convictions and the length of time between those convictions and her conduct on January 6, these old, unscorable convictions do not make her more culpable than Mongelli. As such, the United States is requesting the same sentence for both defendants. Finally, their conduct—particularly re-entering the building despite knowing another rioter was shot and then chasing first responders as they tried to get to the ambulance—demonstrates that they either failed to recognize or did not

15

care about the seriousness and dangerousness of the situation. This too indicates the need for the sentence to specifically deter both Mongelli and Rushing.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[2] This Court must sentence Mongelli and Rushing based on their own conduct and relevant characteristics, but should give substantial weight to the context of their unlawful conduct: their participation in the January 6 riot.

Mongelli and Rushing have pleaded guilty to Counts Three and Four of the Information charging them with violations of 40 U.S.C. § 5104(e)(2)(D), (e)(2)(G). These offenses are Class B misdemeanors. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

This Court has sentenced at least one misdemeanor Capitol breach defendant who was present when Ashli Babbitt was shot.  In *United States v. Ambrose*, 22-cr-302 (DLF), the defendant spent approximately 30 minutes inside the Capitol and was present when Ashli Babbitt attempted to climb into the House of Representatives.  After the shooting, rioters were forced out by police and the defendant exited the Capitol at 2:54 pm.  The defendant pled guilty to violating 40 U.S.C. § 5104(e)(2)(G) and the Court sentenced the defendant to 36 months of probation. *Ambrose* was already present when the shooting occurred and remained in the area.  Mongelli and Rushing initially exited but chose to re-enter the Capitol knowing that someone had been shot and moved towards the scene of the shooting.  All three remained near the scene of the shooting until forced out by law enforcement.  Though *Ambrose* initially minimized his conduct to police by neglecting to mention being present when Babbitt was shot, he did admit to entering the Capitol and to knowing that the Capitol was not open to the public.  Mongelli and Rushing, however, lied about their entry into the Capitol—Rushing claimed she did not enter and Mongelli claimed she was forced in.  They only admitted to some of their conduct in a second interview, and even then, they continued to minimize their conduct.  Moreover, on January 6, Mongelli and Rushing continued to persist in conduct that could have interfered with emergency services by chasing after the emergency personnel as they tried to get Babbitt to a hospital.  As such, Mongelli and Rushing's conduct warrants a period of incarceration.

In *United States v. Misch*, 21-cr-112 (CJN), the defendant was also present near the Speaker's Lobby where Babbitt was shot.  The defendant pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G) and was sentenced to 30 days of incarceration. Misch spent approximately 29 minutes inside the Capitol, saw rioters engage in acts of violence against police, and was near the Speaker's Lobby when Babbitt was shot.  He proactively assisted law enforcement by contacting

the Metropolitan Police Department on January 7, 2021, with information about the shooting and, during this initial interview, admitted to unlawfully entering the Capitol.  His prompt admissions and cooperation are mitigating factors that are not present in this case.  Rather, Mongelli and Rushing lied to police, entered the Capitol twice, and chased emergency personnel trying to render aid.

The Court has sentenced other misdemeanor sentences who did not engage in destruction or violence.  For example, in *United States v. Saer*, 22-cr-374 (DLF), the Court sentenced the defendant to 36 months of probation after the defendant pled guilty to violating 40 U.S.C. § 5104(e)(2)(G).  That defendant entered the Capitol through the Senate Wing Door after watching other rioters violently breach the door and remained in the building for approximately six minutes. After the riot, the defendant used social media to spread false information about the riot.  Rushing and Mongelli's conduct warrant a more significant sentence.  Unlike the defendant in *Saer*, Rushing and Mongelli entered the Capitol twice, despite knowing that a rioter had been shot in the building.  Then, Rushing and Mongelli lied to police when asked about their conduct on January 6.  And though they did not spread false information after the riot, they did record and share gruesome videos of Babbitt's injuries.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v.*

*Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### V.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Mongelli and Rushing must pay $500 in restitution, which reflects in part the role Mongelli and Rushing played in the riot on January 6.[4] Plea Agreements at

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can

¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Mongelli and Rushing's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* Mongelli PSR ¶ 113; Rushing PSR ¶ 107.

## VI.    Fine

Mongelli and Rushing's convictions for violations of 40 U.S.C. §5104(e)(2)(D), and (e)(2)(G) subject them to a statutory maximum fine of $5,000 for Count 3 and $5,000 for Count 4. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, Mongelli and Rushing's financial assets set forth in the PSRs suggest that they are both unable, and are unlikely to become able, to pay a fine.

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Mongelli and Rushing to 30 days incarceration on Count Three and 36 months' probation on Count Four. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea

---

be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

agreement in this case, $500 in restitution.  This sentence would protect the community, promote respect for the law, and deter future crime by imposing restrictions on Mongelli and Rushing's liberty as a consequence of their behavior, while recognizing their acceptance of responsibility for their crimes.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   /s/ Anna Z. Krasinski
ANNA Z. KRASINSKI
Assistant United States Attorney
New Hampshire Bar No. 276778
United States Attorney's Office
Detailed from the District of New Hampshire
(603) 451-7851
anna.krasinski@usdoj.gov